# THOMAS DICKSON v. STATE.

No. A-4251.    Opinion Filed April 5, 1924.

(224 Pac. 723.)

(Syllabus.)

1.  **Indictment and Information—When Duplicitous.** In order to be subject to the objection of duplicity, an indictment or information must charge two distinct and complete crimes, for each of which a separate punishment may be inflicted, and each of which would withstand a demurrer for want of sufficient facts to constitute a crime.

2.  **Same—Information not Bad for Duplicity.** For information charging the crime of robbery in the first degree, and held not to be open to the objection of duplicity in that it also charges in the same count the independent crime of conspiracy to commit a crime, see body of opinion.

3.  **Indictment and Information—Necessary Allegations Against Accessories Before Fact or Principal in Second Degree.** The distinction between accessories before the fact and between principals in the first and second degree in cases of felony has been abrogated by statute, and it is not necessary in this jurisdiction to allege against accessories before the fact or principals in the second degree in an indictment or information any more facts than is required to be alleged against a principal in the first degree as each were known to the common law.

4.  **Robbery—Information—Sufficient Allegation as to Ownership.** Information examined and held to contain a sufficient allegation as to ownership of the property taken in a robbery case.

5.  **Appeal and Error—Essentials of Record to Review Refusal of Requested Instructions.** The refusal to give a requested instruction is not subject to review in the absence of a showing that the instruction was requested and refused in the manner required by the statute, and that the refusal to give the instruction was urged as a ground for a new trial in the lower court. In the absence of such a showing by the record, this court will review nothing but fundamental errors in the instructions.

6.  **Trial—Failure to Instruct on Circumstantial Evidence not Error.** Where the evidence is not entirely circumstantial, the failure to instruct on the law relative to circumstantial evidence is not error.

7. **Indictment and Information—Evidence of Conspiracy with Others than Persons Alleged not Erroneous, Allegation Being Surplusage.** For reasons for holding that certain evidence relative to a conspiracy to rob was not improperly admitted, see body of opinion.

8. **Evidence—Corroboration of Accomplice Sufficient.** Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him witih its commission.

9. **Same—Circumstantial Evidence.** Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

10. **Same—Corroboration Sufficient.** For evidence held to be sufficient to corroborate the evidence of the accomplices, see body of opinion.

Appeal from District Court, Harper County; Arthur G. Sutton, Judge.

Thomas Dickson was convicted of ˒the crime of robbery in the first degree, and he appeals. Affirmed.

Swindall & Wybrant and C. H. Wyand, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. Thomas Dickson was convicted, on the 21st day of September, 1921, in the district court of Harper county, Okla., of the crime of robbery in the first degree, and sentenced to serve a term of 10 years' imprisonment in the state penitentiary.

From the judgment rendered against him defendant appealed to this court by filing herein on the 17th day of March, 1922, petition in error with case-made attached.

It is first urged that the trial court erred in overruling the demurrer to the information. The information, omit-

ting caption and signature of the county attorney, is as follows:

"Now comes D. P. Parker, the duly qualified and acting county attorney, in and for Harper county, state of Oklahoma, and gives the district court of Harper county, state of Oklahoma, to know and be informed that one Thomas Dickson, did in Harper county, and in the state of Oklahoma, on or about the 30th day of March, in the year of our Lord, one thousand, nine hundred and twenty-one and anterior to the presentment hereof, commit the crime of robbery in the first degree in the manner and form as follows, to wit: The said Thomas Dickson did then and there unlawfully, willfully, intentionally, wrongfully and feloniously conspire with and plan with one Joseph Hierholzer, to commit said crime and did aid and abet said Joseph Hierholzer in the commission of said crime, and that said Joseph Hierholzer being aided and abetted by said Thomas Dickson, did then and there wrongfully, and feloniously take certain personal property, to wit, the sum of $60.25, lawful money of the United States of America from the immediate presence of and from the possession of A. C. Clothier, as the cashier of the Citizens' State Bank of Salt Springs, Oklahoma, a banking corporation, and against the will of said A. C. Clothier, accomplished by means of force and fear of great, immediate and unlawful injury to the person of said A. C. Clothier, said fear being brought about in the mind of said A. C. Clothier by said Joseph Hierholzer with force and violence pointing a revolver at and toward said A. C. Clothier, and by said Joseph Hierholzer striking the said A. C. Clothier on the head with a revolver and by said Joseph Hierholzer shooting at said A. C. Clothier with a revolver, said revolver being then and there a deadly weapon, and did then and there and thereby by the employment of said force and fear as aforesaid, obtain possession of and retain possession of said property and prevent and overcome the resistance of said A. C. Clothier to said unlawful and felonious taking of said personal property, said personal property being immediately before and at the time of said wrongful taking in the immediate presence of and in the

possession of said A. C. Clothier, as cashier as aforesaid with the wrongful and felonious intent of the said defendant to deprive the owner thereof and to convert the same to his own use, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state.''

The demurrer is based on the following grounds:

''First. That said information does not state facts sufficient in law to constitute a cause of action in favor of the state of Oklahoma and against this defendant.

''Second. That said information does not state facts sufficient in law to constitute a public offense against the laws of the state of Oklahoma.

''Third. That said information does not state facts sufficient in law to constitute a crime against the laws of the state of Oklahoma.

''Fourth. That said information is duplicitous in this that the same charges the crime of conspiracy to commit a felony under the laws of the state of Oklahoma and also with the commission of a felony.

''Fifth. That said information is duplicitous in that the same charges and sets forth the commission of more than one offense in the same count of the information.''

The ground more particularly urged in the brief filed in behalf of the plaintiff in error is stated under subdivisions 4 and 5 of the demurrer. Succinctly stated, it is this, that the information is duplicitous in that it charges the commission of more than one offense in the same count—first, a conspiracy to commit a felony, and, second, the commission of the felony.

Section 2558, Compiled Statutes 1921, provides:

''The indictment or information must charge but one offense; but where the same acts may constitute different of-

fenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty of, the different offenses may be set forth in separate counts in the same indictment or information and the accused may be convicted of either offense, and the court or jury trying the cause may find all or either of the persons guilty of either of the offenses charged, and the same offense may be set forth in different forms or degrees under different counts; and where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count.''

Section 1649, Compiled Statutes 1921, in part provides:

''If two or more persons, conspire, either: First. To commit any crime.''

First subdivision section 1651, Compiled Statutes 1921, provides:

''No agreement to commit a felony or to commit a misdemeanor amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement.''

In Williams v. State, 16 Okla. Cr. 217, 182 Pac. 718, it was held:

''Under the statute (section 2234, Rev. Laws 1910), the crime of conspiracy to commit a felony or misdemeanor is not complete 'unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement,' and, where a conspiracy to commit a crime is charged, it is necessary that the information contain, in addition to an allegation of the conspiracy to commit the particular crime, an allegation of some overt act or acts done in furtherance and pursuance thereof.''

In the same case, in defining on overt act, the court held:

''An 'overt act' must be something more than evidence of the conspiracy. It must be an act done by one of the

parties to carry out the intent, and it must be such as would naturally effect that result; at least, it must be a step towards the execution of the conspiracy.''

Under the foregoing conspiracy statute, proof of two matters are essential: First, an agreement entered into between two or more persons to commit a crime, and, second, some act besides such agreement done to effect the object of the agreement by one or more of the parties to the agreement. In other words, in addition to the agreement there must have been an attempt to commit the crime itself. It is apparent from the statute that, if this attempt results in the completion of the offense, the conspiracy, as well as the attempt, is necessarily merged in the commission of the completed crime, and the prosecution, therefore, is for the completed offense and not for the conspiracy.

In the foregoing information the only allegations as to a conspiracy are that the said Thomas Dickson did unlawfully, willfully, intentionally, wrongfully, and feloniously conspire with and plan with one Joseph Hierholzer to commit said crime (robbery in the first degree), and did aid and abet said Joseph Hierholzer in the commission of said crime, and the said Joseph Hierholzer, being aided and abetted by the said Thomas Dickson, did, then and there, wrongfully, etc., and then follows the allegations charging that the said Joseph Hierholzer did commit the crime of robbery as defined by our statute. The information, therefore, does not charge the crime of criminal conspiracy, but charges the completed crime of robbery in furtherance of a conspiracy to rob.

The test by which to determine whether an indictment or information is bad for duplicity is well stated by the

Supreme Court of the territory of Oklahoma in the case of Baysinger v. Territory, 15 Okla. on page 388, 82 Pac. 729, in this language:

"In order to be subject to this objection, the indictment must charge two distinct and complete crimes, for each of which a separate punishment may be inflicted, and each of which would withstand a demurrer for want of sufficient facts to constitute a crime."

See, also, State v. Franks, 21 Okla. Cr. 213, 206 Pac. 258; Wharton's Criminal Procedure (10th Ed.) 292.

The information in this case is not open to the objection of duplicity. It contains a sufficient charge of robbery, but it does not contain a charge of conspiracy to commit a crime independent of the charge of robbery. It is not sufficient to say that that the defendant "did feloniously conspire with and plan with one J. H. to commit said crime, and did aid and abet said J. H. in the commission of said crime." Such a charge of conspiracy would evidently be subject to demurrer.

Section 2574, Compiled Statutes 1921, provides:

"The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be prosecuted, tried and punished as principals, and no additional facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal."

It is not necessary for the pleader to allege that the robbery was the result of a conspiracy in which the accused aided and abetted one Joseph Hierholzer. The distinction

between accessories before the fact and between principals in the first and second degree in cases of felony has been abrogated by the foregoing statute, and it is not necessary in this jurisdiction for the pleader to allege any additional fact or facts as against accessories before the fact or principals in the second degree, as they were known to the common law, than are required to be alleged against a principal in the first degree, as known to the common law. The information in this case includes considerable unnecessary matter, which may be treated as surplusage, but it is not open to the objection that it is bad for duplicity.

It is further contended that the demurrer to the information should have been sustained because the same does not contain an allegation of ownership of the property alleged to have been taken in the robbery.

The information charges the taking of $60.25 from the immediate presence of and from the possession of A. C. Clothier as cashier of the Citizens' State Bank of Salt Springs, Okla., against the will of the said A. C. Clothier, and accomplished by means of force and fear of great, immediate, and unlawful injury to the person of the said A. C. Clothier, etc., and further with the wrongful and felonious intent of the defendant to deprive the owner thereof and to convert the same to his own use.

Our statute (Comp. St. 1921, § 1784) defines robbery as follows:

"Robbery is a wrongful taking of personal property in the possession of another from his person or immediate presence and against his will, accomplished by means of force or fear."

We think the information sufficiently definite and certain on the subject of ownership of the property taken to in-

form the defendant that he was not accused of taking his own property, but that he was accused of taking property which was in the possession of A. C. Clothier, the cashier of the Citizens' State Bank of Salt Springs, Okla., with intent to convert such property to his own use. In law "convert" conveys the idea of a dishonest appropriation. The information is sufficient in this respect. Wade v. State, 18 Okla. Cr. 592, 197 Pac. 180; Tyson v. United States, 7 Okla. Cr. 433, 122 Pac. 733; State v. Brill, 21 Idaho, 269, 121 Pac. 79.

On the whole, we think the crime charged in the said information is clearly and distinctly set forth in language such as to enable the defendant to know with what crime he was charged; that the words used in the indictment clearly negative the idea of the ownership of the said money in the defendant, and that such allegation did not tend to prejudice the defendant in regard to any substantial right. We conclude, therefore, that the court did not err in overruling the demurrer to the information.

It is also contended that the trial court erred in refusing to give a certain instruction which it is alleged was requested to be given.

This assignment of error relates to the refusal of the court to instruct that the witness Joseph Hierholzer and Charles Brankel were what are known in law as accomplices, etc.

The record before us discloses that as to this particular instruction the fifth subdivision of section 2687, Compiled Statutes 1921, was not complied with. The motion for a new trial in the lower court discloses that as to all of the other requested instructions counsel based a ground for a motion for a new trial but made no reference to this alleged re-

quested instruction. The record does not show that it was ever filed or became a part of the record in the case. It was not signed by the trial judge as required, and refused by him. The first mention of this alleged error appears in the petition in error filed in this court. Before this matter is subject to review by this court there must be a showing that the instruction was requested and refused in the manner required by the statute, and that the refusal to give the instruction was urged as a ground for a new trial in the lower court, or else the alleged error must have been fundamental. Heatley v. Territory, 15 Okla. 72, 78 Pac. 79; Maddox v. State, 12 Okla. Cr. 462, 158 Pac. 883. We hold, therefore, that as to this assignment of error the record presents nothing for review by this court, as no fundamental error appears.

It is next contended that the trial court erred in failing to instruct the jury upon the law relative to circumstantial evidence. This was not error, as an examination of the record discloses that the evidence was not entirely circumstantial.

It is next contended that the trial court erred in admitting evidence to go to the jury relative to a conspiracy between Thomas Dickson, Charles Brankel, Bennett Highfill, and Joseph Hierholzer to rob the bank at Salt Springs, Okla. It is contended in support of this assignment of error that, inasmuch as the information only charged a conspiracy between Hierholzer and Dickson to commit the crime, the evidence that others were also implicated in said conspiracy was improperly admitted and prejudicial to the defendant. In view of the fact that our statutes permit accessories before the fact, as well as principals in the second degree, to be informed against as principals, and that no further allegations are necessary as against them than are necessary

against principals in the first degree, and in view of the further fact that heretofore in this opinion it has been held that the allegation as to the conspiracy was merely surplusage, it is apparent that this assignment of error is without merit.

It is next contended that the evidence is insufficient to sustain the conviction. Joseph Hierholzer and Charles Brankel, who were accomplices of this defendant, each testified to facts sufficient to sustain this conviction, provided their testimony is corroborated by other evidence independent of that of the accomplices, which tends to connect this defendant with the commission of the robbery within the rule required by section 2701, Compiled Statutes 1921.

Construing the foregoing statutory provision, this court, in Moody v. State, 13 Okla. Cr. 327, 164 Pac. 676, held as follows:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission. Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only. It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof."

Guided by the foregoing statute and holding of this court, we now proceed to consider the question of whether or not the evidence of the accomplices was sufficiently corroborated.

Joe Hierholzer testified that he alone robbed the Citizens' State Bank of Salt Springs on the afternoon of Wednesday, March 30, 1921. He testified that such robbery was the culmination of a conspiracy entered into by him, Thomas Dickson, Charles Brankel, and Bennett Highfill for that purpose.

Dickson and Highfill had long been residents of that community and had known each other for 18 years; they were farmers and had had considerable business dealings with each other. Brankel is a stepson of Dickson, and was frequently at Dickson's house, although not living there at the time of the formation of this conspiracy. He also was a friend and acquaintance of Highfill. Hierholzer, who directly committed the crime, was a stranger in that community, and testified that for that reason it was agreed between the conspirators that he alone should do the actual robbing.

Hierholzer appeared at the home of Dickson some 8 weeks before the robbery was committed. He was in company with a man by the name of Renshaw, a relative of Mrs. Dickson. They came to Dickson's house about 9 o'clock at night. They came from Highfill's and had a horse that Dickson knew belonged to Highfill. It appears that both Renshaw and Hierholzer were fugitives from justice. To use a common expression, they were "on the scout." The officers particularly were at that time searching for Renshaw, and Renshaw disappeared from Dickson's premises before this conspiracy was entered into. Dickson testified that Renshaw introduced Hierholzer to him as one Joe Dickson, the son of a brother of this defendant who was at that time residing in Oklahoma City. Hierholzer, on the other hand, testified that he was not introduced to Dickson as Joe Dickson, but that after some circumlocution it was agreed between him and Tom Dickson and Renshaw that it would allay suspicion if he were introduced by Dickson as his nephew Joe Dickson.

Thereafter Dickson, during the 8 weeks immediately preceding this robbery, and while Hierholzer was staying at his house, introduced Hierholzer to numerous of his neighbors as his nephew Joe Dickson. Dickson admits this and claims that he was in perfect good faith in making such an introduction of Hierholzer to his neighbors and friends, and testified that he did not know that Hierholzer was a person other than his nephew, until he himself was arrested and was being taken to jail charged with this particular crime. Dickson also testified that Hierholzer claimed that his purpose in that vicinity was to obtain leases to prospect for oil, but there is no evidence in this record that, during the entire 8 weeks that Hierholzer remained at Dickson's house, he made any effort whatever to in any manner obtain from either Dickson or any of his neighbors any lease for oil-drilling purposes. During this entire period of eight weeks Hierholzer remained close to the Dickson premises. He helped chop some wood and repair some fencing—a rather unusual occupation for a broker of oil leases. Another remarkable circumstance is that Dickson claims that during all this entire 8 weeks, and it must be presumed he had numerous conversations with Hierholzer, he was never able to discover but that Hierholzer was in fact his nephew Joe Dickson.

That Dickson's testimony concerning his introduction to Hierholzer, and concerning his lack of knowledge as to his true identity, is a fabrication, we think is easily discernible from Dickson's conduct as disclosed by his own testimony.

After this robbery was committed, Hierholzer, who at the time of its commission was riding a horse which Brankel and Highfill had obtained for him, and using a saddle which Dickson had obtained for him, came back immediately to premises occupied by Dickson. During the commission of the robbery Hierholzer had been shot in the side. If Dickson was inno-

cent of his identity and in fact believed, as he testified, that Hierholzer had engaged in a horse race, got into a fight, and was shot during the fight, and if he was his nephew, he certainly would have taken Hierholzer to his own home and there procured, as soon as possible, the necessary medical attention for him. In this connection it must be remembered that Dickson testified that at this time he did not know but that Hierholzer was in truth and fact his nephew Joe Dickson. However, he did not take Hierholzer to his home, but left him in a cabin on another 80 acres owned by Dickson about a mile and a half from his home. He procured no medical attention for Hierholzer, but surreptitiously Dickson and his wife carried food to Hierholzer to this cabin, although Dickson had learned of the bank robbery, and before that the officers were searching that community for the man who had committed it, and had made inquiry of Dickson whether or not the man who had been staying at his house was there at that time, and Dickson replied, in substance, that he had left his house a couple of days before, turned his horse loose, and that the horse had wandered back, but that the man had never returned. This was a point-blank falsehood, and to our mind is unexplainable, consistent with Dickson's innocence, and with what he claims to have been his subsequent and honest endeavor to deliver Hierholzer to the officers as the perpetrator of the crime.

Another extremely incriminating circumstance disclosing guilty knowledge on the part of Dickson is the fact that after the robbery was committed he turned the horse that Hierholzer had been using on the day of the robbery loose into his wheat field in a canyon where it would be hard to discover. Now in this connection Dickson claims that he believed the horse belonged to Charles Brankel, that on the Monday night preceding the robbery, at about midnight, Brankel

brought this particular horse to Dickson's house, and it was kept there until the robbery was committed. Brankel also had another horse with him which he (Brankel) rode on the day the robbery was committed. After the robbery these two horses were tied close to the old deserted shack in which Hierholzer was concealed near the canyon. Dickson turned the horse that Hierholzer had used into his pasture but left the other horse where it had been hitched. This is significant, because if both horses belonged to Brankel, as Dickson claimed, and Brankel was there at the time, which is undisputed, why should Dickson turn one of Brankel's horses loose and not the other? Dickson did not consult Brankel about this, but turned the horse loose on his own authority.

Another significant circumstance is this: Hierholzer and Brankel both testify to the formation of the conspiracy to rob this bank. The conspiracy was first talked over in a canyon near Dickson's house, and it was there determined, according to Hierholzer's and Brankel's testimony, that it would be best to use a horse instead of an automobile in perpetrating the robbery for purposes of escape. It then became necessary, according to the testimony of the accomplices, to procure a strange horse for this purpose. The duty of procuring this horse devolved upon Highfill and Brankel, and Brankel says that Dickson knew when he (Brankel) came to Dickson's house on Monday night, before the robbery was committed on the following Wednesday, that this second horse which Brankel was leading was to be used by Hierholzer in committing the robbery. Hierholzer also testifies to this fact. Dickson, on the other hand, testifies that he did not know that to be a fact; that before Brankel came there at midnight, leading a strange horse, Brankel told him he had traded for the horse, but he made no inquiry as to what he

traded, who he traded with, or anything further about the horse. This perhaps would not be such a significant circumstance were it not for the fact that Brankel was a young man, over 20 years younger than Dickson, and was also Dickson's stepson. Under the circumstances, therefore, it is evident that Dickson took very little interest in the business affairs of his stepson.

Another significant circumstance is the fact that Dickson admits that he had a promissory note for $1,200 just about to fall due at the time this robbery was committed, and further that he had no funds with which to pay this note.

Another circumstance is the fact that Dickson borrowed the saddle that was used by Hierholzer at the time of the robbery, and after the robbery was committed Dickson returned the saddle to its owner before any arrests were made, At the time Dickson borrowed the saddle he made a false statement as to the use intended to be made of it.

There are numerous other incriminating circumstances such as tracks, etc., in this record, clearly corroborating the testimony of these two accomplices. In fact it has never been our privilege to examine a record where the accomplices' testimony was more thoroughly corroborated than in this case. To give mention to all of these corroborating circumstances would unnecessarily prolong this opinion. Suffice it to state that the evidence is not only sufficient to sustain the conviction, but with this record before us the jurors would have been recreant to their sworn duty had their verdict been otherwise.

Finally it is contended that the trial court erred in not instructing the jury, as requested, that in case a verdict of guilty should be returned the jury should fix the punish-

ment. The court imposed the minimum penalty of 10 years' imprisonment in the penitentiary fixed by statute for robbery in the first degree. The jury returned a general verdict of guilty, but failed to agree upon the punishment. It is apparent, therefore, that there were some members of the jury that did not think this defendant should have received the minimum punishment.

The judgment is affirmed.

BESSEY and DOYLE, JJ., concur.